FILED

2026 Mar-17  PM 03:49
U.S. DISTRICT COURT
N.D. OF ALABAMA

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | |
|---|---|
| FARMERS PROPERTY AND CASUALTY INSURANCE COMPANY, <br><br> Plaintiff, <br><br> v. <br><br> GLEN A CARTER, *et al.*, <br><br> Defendants. | ) ) ) ) ) ) ) ) ) ) ) ) <br> **Case No.: 2:24-cv-00313-MHH** |

## MEMORANDUM OPINION

Plaintiff Farmers Property and Casualty Insurance Co. has asked the Court to declare that it does not owe defendant Glen Carter or his minor daughter, B.G.C., a defense or indemnity in state-court litigation brought by co-defendants Kenn and Lisa Gaddis for injuries their minor daughter, E.K.G., sustained while riding as a passenger in a Jeep driven by B.G.C. (Doc. 1). Farmers and the defendants have filed cross-motions for summary judgment. (Doc. 34; Doc. 35; Doc. 37). This opinion addresses the parties' motions. The opinion begins with the standard that governs cross-motions for summary judgment. The Court then summarizes the evidence and the relevant provisions of Mr. Carter's Farmers insurance policy.

1

Finally, the Court examines the evidence and the policy provisions under Alabama's rules for the interpretation of insurance contracts.

\*\*\*

A district court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). To demonstrate a genuine dispute as to a material fact that precludes summary judgment, a party opposing a motion for summary judgment must cite "to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials." FED. R. CIV. P. 56(c)(1)(A). "The court need consider only the cited materials, but it may consider other materials in the record." FED. R. CIV. P. 56(c)(3).

When considering a motion for summary judgment, a district court must view the evidence in the record in the light most favorable to the non-moving party and draw reasonable inferences in favor of the non-moving party. *White v. Beltram Edge Tool Supply, Inc.*, 789 F.3d 1188, 1191 (11th Cir. 2015). "A litigant's self-serving statements based on personal knowledge or observation can defeat summary judgment." *United States v. Stein*, 881 F.3d 853, 857 (11th Cir. 2018); *see also Feliciano v. City of Miami Beach*, 707 F.3d 1244, 1253 (11th Cir. 2013) ("To be

sure, Feliciano's sworn statements are self-serving, but that alone does not permit us to disregard them at the summary judgment stage."). Even if a district court doubts the veracity of the evidence, the court cannot make credibility determinations; that is the work of a factfinder. *Feliciano*, 707 F.3d at 1252 (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)). Still, conclusory statements in a declaration cannot by themselves create a genuine issue of material fact. *See Stein*, 881 F.3d at 857 (citing *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888 (1990)).

Cross-motions for summary judgment do not alter the Rule 56 standard. *United States v. Oakley*, 744 F.2d 1553, 1555–56 (11th Cir. 1984). When considering cross-motions for summary judgment, district courts "should be very careful in their analysis to ensure that the proper party receives the benefit of the summary judgment standard." *FCOA LLC v. Foremost Title & Escrow Servs. LLC*, 57 F.4th 939, 959 (11th Cir.), *cert. denied*, 144 S. Ct. 103 (2023). When parties file cross-motions for summary judgment, a district court has "three options: granting summary judgment for the plaintiff under the defendant's best case, granting summary judgment for the defendant under the plaintiff's best case, or denying both motions for summary judgment and proceeding to trial." *FCOA*, 57 F.4th at 959.

The burden of proof in this diversity action "is a substantive issue and is therefore controlled by state law." *Wynfield Inns v. Edward LeRoux Grp., Inc.*, 896 F.2d 483, 491 (11th Cir. 1990) (citations omitted). In Alabama, "proof by substantial

evidence shall be required to submit an issue of fact to the trier of the facts." ALA. CODE § 12-21-12(a).[1] "Substantial evidence" means "evidence of such quality and weight that reasonable and fair-minded persons in the exercise of impartial judgment might reach different conclusions as to the existence of the fact sought to be proven." ALA. CODE § 12-21-12(d).

***

Mr. Carter and non-party Judy Upton were married but divorced in 2014. (Doc. 37-7, p. 5).  B.G.C is their daughter.  (*See* Doc. 37-7, p. 5, tp. 10).  In 2019, Ms. Upton bought a Jeep Wrangler.  (Doc. 33, pp. 38–40, tpp. 19–21).  Ms. Upton wanted something with a larger carrying capacity than her convertible.  (Doc. 33, pp. 39, tpp. 20).  B.G.C. was 13 years old when Ms. Upton bought the Jeep.  (Doc. 33, pp. 38–40, tpp. 19–21).  Ms. Upton insured the Jeep through Allstate.  (Doc. 33, pp. 40–41, tpp. 21–22).  After B.G.C. turned 16, Ms. Upton did not list B.G.C. as a driver on her Allstate policy because B.G.C. did not reside with Ms. Upton.  (Doc. 33, pp. 40–41, tpp. 21–22).

B.G.C. learned to drive and took her driver's license test in the Jeep.  (Doc. 37-1, pp. 12, tpp. 39; Doc. 37-6, pp. 9–10, tpp. 27–35).  Ms. Upton primarily taught

---

[1] In cases in which federal courts exercise diversity jurisdiction under 28 U.S.C. § 1332, the courts apply state substantive law.  *See Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 78 (1938).  The Court applies Alabama substantive law to resolve the parties' motions because the Farmers policy does not contain a choice of law provision.

B.G.C. how to drive; Ms. Upton had possession of the Jeep "[o]ff and on" while B.G.C. had her learner's permit. (Doc. 33, p. 42, tp. 26). It is not clear from the evidence when B.G.C. received her learner's permit, but she received her driver's license within a week of her sixteenth birthday. (Doc. 37-7, p. 8, tp. 24).[2]

On December 4, 2021, a few months before B.G.C.'s sixteenth birthday, Mr. Carter and Ms. Upton bought a 1971 Chevrolet Chevelle for B.G.C. to drive when she received her driver's license. (*See* Doc. 37-1, pp. 7–8, 10, tpp. 21–22, 32; Doc. 37-5, p. 3; Doc. 37-6, p. 5, tp. 13; Doc. 37-7, p. 7, 30, tp. 19, ex. 1; *see also* Doc. 33, pp. 33–34; Doc. 36-10, pp. 14–15). Mr. Carter added the Chevelle to his Farmers automobile insurance policy before the end of 2021. (Doc. 37-7, p. 7, tp. 18:22–19:11; *see also* Doc. 33, p. 41; Doc. 37-5; Doc. 37-1, p. 9, tp. 26).

From the beginning, the Chevelle was "never . . . fully operational." (Doc. 37-1, p. 7, tp. 20:7–8). When Mr. Carter test drove the Chevelle, he found that the car had a "rough idle" and that the car's steering "pulled to one side . . . really hard," so he knew the Chevelle "was going to need some work." (Doc. 37-1, p. 7, tpp. 20–21; *see also* Doc. 37-1, p. 11, tp. 37; Doc. 37-7, pp. 7, tp. 20). The Chevelle stalled at red lights. (Doc. 37-1, p. 8, tp. 24; Doc. 37-7, pp. 7, tp. 20:9–12). The Chevelle overheated the day Mr. Carter first drove it home. (Doc. 37-1, p. 7, tp. 20:12–14).

---

[2] The deposition transcripts the parties have filed in support of their respective motions for summary judgment are missing transcript pages that discuss how B.G.C. learned to drive. The above factual summary is based on the transcript pages that were included.

Between December of 2021 and April of 2022, Mr. Carter parked the Chevelle in his driveway or garage. (Doc. 37-1, pp. 11–12, tpp. 37–38).

In early April, Mr. Carter took the Chevelle to a mechanic. (Doc. 37-1, p. 12, tpp. 38–39). The mechanic claimed to have solved the overheating problem, but after the repair, the Chevelle "still idle[d] really rough" and stalled. (Doc. 37-1, pp. 13–14, tpp. 45–46). Consequently, B.G.C. drove the Chevelle only "once or twice" after this repair. (Doc. 37-1, p. 8, 13–15, tpp. 23, 45–52; Doc. 37-7, p. 12, tp. 40). No one drove the Chevelle after the April 2022 test drives. (Doc. 37-1, pp. 13–15, tpp. 45–52).

Ms. Upton testified that she never intended the Jeep "to be B.G.C.'s vehicle" or for B.G.C. to use the Jeep "for a long period of time." (Doc. 31, p. 44–47, tpp. 31–38). According to Ms. Upton, if she had intended for B.G.C. to drive the Jeep, she would have sold the car to Mr. Carter for a nominal amount and added the Jeep to Mr. Carter's insurance policy. (Doc. 33, p. 46, tp. 37). In his February 9, 2024 deposition, Mr. Carter stated that he "knew at least by [B.G.C.'s sixteenth] birthday which was in [late] April of 2022 that the Chevelle was not going to work out to be her car." (Doc. 37-1; p. 22). He said he was unsure whether the Jeep was intended by Ms. Upton to be a permanent gift to B.G.C., but he acknowledged that the Jeep was "[B.G.C.'s] car . . . to use" from her sixteenth birthday forward. (Doc. 37-7, p. 8, tpp. 22–23). He agreed that "[t]here was no intent to get [the Chevelle] running

6

because [they] were still trying to decide what [they were] going to do." (Doc. 37-7, p. 14, tp. 47). In his September 30, 2024 deposition, Mr. Carter stated that B.G.C. only was using the Jeep until the Chevelle could be repaired and that the Chevelle was supposed to be B.G.C.'s car. (Doc. 37-1, p. 14, tpp. 47–48). B.G.C. stated the Jeep was a birthday or Christmas gift to her. (Doc. 73, pp. 4–10).

Once she had her license, B.G.C. drove the Jeep to school each day and used the Jeep to run errands. (Doc. 37-1, p. 12, tpp. 39–40; Doc. 37-6, p. 10, tp. 35). B.G.C. primarily lived with Mr. Carter and parked the Jeep at his house. (Doc. 37-1, p. 13, tp. 42; Doc. 37-6, pp. 6, 8, 19, tpp. 16, 24, 73).[3] The Chevelle sat unused and "never operational" in Mr. Carter's driveway or garage. (Doc. 37-1, p. 15, tp. 52:4–6).

In October 2022, while driving the Jeep, B.G.C. swerved to avoid a collision. (Doc. 37-2, p. 2; Doc. 37-6, pp. 24–31, tpp. 91–118). B.G.C. lost control of the Jeep, (Doc. 37-6, p. 26, tpp. 100–01), and the Jeep left "the roadway to the left" and "continued for approximately 222 feet while overturning approximately 4–5 times," (Doc. 37-2, p. 3). E.K.G., a passenger in the Jeep, "was not wearing [her] safety belt and was ejected from the vehicle when the vehicle overturned." (Doc. 37-2, p. 3).

---

[3] Ms. Upton took care of the Jeep's maintenance and oil changes while B.G.C. used it. (Doc. 37-1, p. 13, tp. 44).

E.K.G. suffered permanent injuries; she requires continuous medical treatment. (Doc. 36-6).

After the accident, Mr. Carter and Ms. Upton bought another vehicle for B.G.C. to drive.  (Doc. 37-7, p. 13, tp 42:2–12).  The vehicle was titled in Mr. Carter's name and placed on his Farmers policy.  (Doc. 37-7, p. 13, tp. 42).

Under Mr. Carter's primary Farmers policy at the time of the Jeep accident, policy number 6830842890, Mr. Carter is the named insured, and the insured vehicles are a 2017 Ford F150 and a 1971 Chevrolet "Chavell."  (Doc. 37-5, pp. 2-3).  The policy period runs from March 20, 2022 until March 20, 2023.  (Doc. 37-5, p. 4).

The Farmers policy identifies Mr. Carter and B.G.C. as "**Household Drivers**" and provides, subject to the policy limits, that Farmers "will pay damages for [bodily injury] and [property damage] to others for which the law holds an **insured** responsible because of a **loss** resulting from owning, maintaining, or using a **covered auto** or **non-owned auto**."  (Doc. 37-5, pp. 4, 11).[4]  Farmers agrees to "defend an **insured** . . . against any suit or claim seeking these damages," but Farmers has "no

---

[4] The Farmers policy includes the bolded text quoted in this opinion.  The bolded text indicates that the policy defines the term.

Under the policy's general definitions, the term "**loss**" means "direct, sudden and accidental damage or total or partial theft;" it "does not include any actual or perceived reduction in market or resale value."  (Doc. 37-5, p. 9).

duty to defend an **insured** for any suit or settle any claim not covered" under the policy. (Doc. 37-5, p. 11). B.G.C. is an "**insured**" under the policy with respect to the F150, the Chevelle, a "**substitute auto**," or a "**non-owned auto**" because she is a **relative** of Mr. Carter. (Doc. 37-5, pp. 8–9) (defining **COVERED AUTO** and **INSURED**).[5]

Under the policy's general definitions, a "**covered auto**" includes "any **auto** . . . which is shown in the Declarations and is owned by . . . **you**" and "a **substitute auto**." (Doc. 37-5, p. 8). Under the policy's general definitions, a **substitute auto** is "an **auto**":

> which is not owned by **you** or any **relative**, and which is used with the owner's permission to replace a **covered auto** for a short time. The **covered auto** has to be out of normal use due to:
>     1. breakdown;
>     2. destruction;
>     3. **loss**;
>     4. repair; or
>     5. servicing.

(Doc. 37-5, pp. 10–11). An endorsement to the policy states that a "**non-owned auto**" is:

> [A]n **auto** . . . while being used by **you** or a **relative**. The vehicle must not be owned by, furnished to, or made available for regular use by **you**, or any **relative**. However, an **auto** . . . owned by, furnished to, or made

---

[5] Under an Alabama law endorsement to the policy, the term "**relative**" means "a person, other than you, who is a resident of your household, and is related to you by blood, marriage, civil union, registered domestic partnership, or adoption." (Doc. 37-5, p. 24). Under this definition, Ms. Upton is not a relative of Mr. Carter, the policyholder, because she was divorced from Mr. Carter and no longer living with him. B.G.C. is a relative because she is Mr. Carter's daughter and resided primarily with him.

available for regular use by a **relative** shall be a **non-owned auto** when it is used by:

    **a. you**; or

    **b.** any other **relative**.

(Doc. 37-5, p. 28).[6]

Under Mr. Carter's Farmers excess liability policy, subject to the policy limits, Farmers must "pay all sums in excess of the **retained limit** for **damages** to others caused by an **occurrence** for which the law holds an **insured** responsible and to which this policy applies." (Doc. 37-8, p. 6).[7] The policy excludes coverage for personal injury or property damage "arising out of ownership, maintenance or use of any . . . land motor vehicle owned by . . . or regularly used by an **insured** unless covered under an **underlying policy**." (Doc. 37-8, p. 7). Insured "means **you** or a **relative** residing in **your** household." (Doc. 37-8, p. 16).[8] The excess liability policy defines relative as "a person related to **you** by blood, marriage or adoption." (Doc.

---

[6] The endorsement supersedes the "non-owned auto" provision in the "General Definitions" section of the policy. (*See* Doc. 37-5, p. 10).

[7] The **retained limit** includes "the greater of the limit of liability required to be maintained in an **underlying policy** and the limit of liability actually carried in an **underlying policy**" or "the sum of the limits of the **underlying policies** and any other insurance which applies to the **occurrence**." (Doc. 37-8, p. 10). The policy defines **underlying policy** as "a policy listed as an underlying policy in the Declarations." (Doc. 37-8, p. 10). **Damages** includes "the cost of paying those who suffer **personal injury** or **property damage**" but does "not include awards designated as punitive, exemplary, or statutory multiple damages, except for those **damages** awarded under the Alabama Wrongful Death Statute." (Doc. 37-8, pp. 9, 11). **Occurrence** "means an accident, including continuous or repeated exposure to the same condition that results during the policy period in **personal injury** or **property damage**." (Doc. 37-8, p. 9).

[8] **You** and **your** "mean the named **insured** shown in the Declarations." (Doc. 37-8, p. 9).

10

37-8, p. 10).  **Auto** "means a land motor vehicle," and **non-owned auto** "means an **auto** not owned by or furnished for the regular use of an **insured**."  (Doc. 37-8, p. 9).

In May 2023, E.K.G.'s parents, the Gaddises, individually and on behalf of E.K.G., sued B.G.C. through Ms. Upton, Allstate, and Farmers in state court.  (Doc. 1-1).[9]   In Count Six of their complaint, the Gaddises describe Farmers as an "uninsured/underinsured motorist" insurer "under policy number 6830842890," (Doc. 1-1, p. 7, ¶ 34; Doc. 37-5, p. 3), and the Gaddises seek a judgment against Farmers for "the full amount of insurance plus interest" under "each [Farmers] policy" that is "applicable" to the Gaddises' claims, (Doc. 1-1, p. 7).

The Gaddises amended their state-court complaint to add claims against Ms. Upton and Mr. Carter for negligence and wantonness, negligence *per se*, and negligent and wanton entrustment.  (Doc. 37-4, pp. 2–7, ¶¶ 37–75).[10]   The Gaddises later amended their state-court complaint again to add declaratory judgment claims against Allstate and Farmers.  (Doc. 1-3).  The Gaddises request a declaration that

---

[9] In addition to insuring Ms. Upton, Allstate also provided underinsured motorist coverage to the Gaddises.  (Doc. 1-1, p. 2, ¶ 4; Doc. 1-1, p. 6, ¶ 25).  The Gaddises also sued their umbrella insurer, Liberty Mutual Insurance Co.  (Doc. 1-1, p. 3, ¶ 5; Doc. 1-1, pp. 6–7, ¶ 30).

[10] In the amended complaint, the Gaddises also asserted a wantonness claim against B.G.C.  (Doc. 37-4, pp. 7–8, ¶¶ 76–81).

coverage exists under the UIM and excess liability provisions in the Farmers policy. (Doc. 1-3, pp. 5–9, ¶¶ 96–112).

After the Gaddises filed their second amended complaint in state court, Farmers filed this lawsuit against Mr. Carter and the Gaddises. (Doc. 1). Farmers seeks a declaration that it does not owe Mr. Carter and B.G.C. a defense or indemnity under the "liability portions" of the policy Farmers issued to Mr. Carter. (Doc. 1, pp. 9–10). In its complaint, Farmers does not address UIM coverage. Farmers asserted that it does not owe coverage to Mr. Carter and B.G.C. because:

> **a.** The allegations made by Defendant E.K.G. in support of her wantonness claims are such that the alleged wantonness would not be considered an "accident" as that term is defined in the Policy. The Policy provides coverage for "bodily injury" or "property damage" caused by an "accident." In the absence of an "accident", the Policy provides no coverage.
>
> **b.** The claims arising out of the subject accident are not covered because Defendant B.G.C. was not driving a covered automobile as defined by [Farmers]'s Policy at the time of the Accident.

(Doc. 1, pp. 8–9, ¶ 20).[11] Farmers has moved for summary judgment only on the latter ground.[12] After Farmers filed this lawsuit, the state court dismissed without

---

[11] In its summary judgment motion, Farmers also argues that Mr. Carter does not qualify for coverage because he did not own or maintain the Jeep, and he did not use the Jeep during the accident. (Doc. 37, p. 13; Doc. 41, pp. 13–14). The Court is not persuaded that Mr. Carter had to use the Jeep for coverage to be available. The insuring language in the policy does not limit coverage to instances in which Mr. Carter was using a covered auto or a non-owned auto. The policy language is written in the passive voice, leaving the identity of the individual using a covered auto or non-owned auto unspecified.

[12] Farmers's motion for summary judgment contains a generic statement that Farmers sought

prejudice the Gaddises' declaratory judgment claim against Farmers concerning "coverage under any liability policy or umbrella policy." (Doc. 25-2, p. 5).

\*\*\*

The case thus turns on whether the Jeep was covered under Mr. Carter's Farmers policy. The Jeep is covered if it qualifies as a "covered auto" or a "non-owned auto." (*See generally* Doc. 37-5).

For the Jeep to qualify as a **non-owned auto**, the Jeep "must not be . . . made available for regular use by" Mr. Carter or B.G.C. (*See* Doc. 37-5, p. 28).[13] Non-owned auto provisions like the one at issue here generally are "designed as a convenience to the insured to enable coverage in the case of occasional and sporadic use of [unlisted] vehicles." *Benjamin v. Plains Ins. Co.*, 650 F.2d 98, 100 (5th Cir. Unit A July 1981) (analyzing Texas law).[14] The "regular use" exclusions in such provisions are "designed to prevent an insured, who owns or regularly uses more than one vehicle, from securing one policy of insurance covering a specific vehicle

---

judgment in its favor "as to all matters set forth in this declaratory judgment action," (Doc. 37, p. 1), but Farmers did not specifically pursue its argument in its complaint that the defendants' wantonness allegations meant the Jeep crash was not an accident. The Eleventh Circuit has held that a district court "could properly treat as abandoned a claim alleged in the complaint but not even raised as a ground for summary judgment. *Road Sprinkler Fitters*, 10 F.3d at 1568 (citing *Lazzara v. Howard A. Esser, Inc.*, 802 F.2d 260, 269 (7th Cir. 1986)). The Court thus concludes that Farmers has either abandoned this argument or does not believe it is a proper subject for summary judgment.

[13] B.G.C. must have used the Jeep, (Doc. 37-5, p. 28), and she did, (Doc. 37-2, p. 2).

[14] Fifth Circuit cases decided before October 1, 1981 are binding precedent in the Eleventh Circuit. *Bonner v. City of Prichard*, 661 F.2d 1206, 1207 (11th Cir. 1981) (en banc).

and operating other vehicles under the coverage of that one policy." *Am. Auto. Ins. Co. v. Eng.*, 94 So. 2d 397, 401 (Ala. 1957).  Farmers argues that Ms. Upton made the Jeep "available for regular use by" B.G.C.  (*See* Doc. 37, p. 17).  The defendants, citing *Holt v. State Farm Mutual Automobile Insurance Co.*, 507 So. 2d 388 (Ala. 1986), contend that whether a car is available for regular use is an issue of fact for a jury.  (Doc. 38, pp. 6–8).

In *Holt*, a plaintiff "was involved in an automobile accident while driving a Buick automobile owned by her stepmother-in-law."  *Holt*, 507 So. 2d at 389.  The policy insuring the Buick did not provide adequate coverage, so the plaintiff sued her insurer for "liability and medical coverage."  *Holt*, 507 So. 2d at 389.  The plaintiff's policy included liability coverage for the use of a non-owned vehicle.  *Holt*, 507 So. 2d at 389.  The policy defined non-owned vehicle to exclude a car "furnished or available for the regular or frequent use of" the plaintiff.  *Holt*, 507 So. 2d at 389.

The Alabama Supreme Court summarized the evidence concerning the plaintiff's use of the vehicle as follows:

> [The plaintiffs] owned three vehicles—including [a] Ford—which were all insured through State Farm.  However, the [plaintiffs] lent the Ford to their son and daughter-in-law to drive until the son and daughter-in-law could purchase a larger automobile to transport their newly born twins.  The [plaintiffs]' son and daughter-in-law left their small truck at the [plaintiffs]' house for [the plaintiff] to drive if she desired.

14

> [The plaintiff's stepmother-in-law] was living with [the plaintiffs] while she was recuperating from surgery. [The stepmother-in-law] asked [the plaintiff] to drive her Buick to and from [the plaintiff]'s place of employment to build up the Buick's battery and to keep the automobile in running condition. [The stepmother-in-law] gave [the plaintiff] the keys to the Buick and did not state a date on which [the plaintiff]'s use of the Buick was to cease. No limitations on the use of the Buick were specified . . . . [The plaintiff] drove the Buick to and from her place of employment for about ten days before the accident. On her way to work, she picked up her son's maid and drove her to the son's house.

*Holt*, 507 So. 2d at 390.

In its analysis, the Alabama Supreme Court first noted that it had previously "construed the term[s 'available for regular use' and] 'regular' as [they are] used in the non-owned automobile exclusion" context. *Holt*, 507 So. 2d at 394 (citing *Cotton States Mut. Ins. Co. v. Michalic*, 443 So. 2d 927, 930 (Ala. 1983), *overruled on other grounds*, *Holt*, 507 So. 2d 388). "Available for regular use" means that the "thing to which it refers can be usually and regularly had or be used whenever it is wanted, needed or desired." *Holt*, 507 So. 2d at 394 (quoting *Cotton States*, 443 So. 2d at 930). "Regular" means "[s]omething of a steady or uniform course, practice or occurrence as opposed to occasional or incidental." *Holt*, 507 So. 2d at 394 (quoting *Cotton States*, 443 So. 2d at 930).

The Alabama Supreme Court explained that "[w]hen conflicting inferences of fact may be drawn under the evidence, . . . the issue is not one of construction [of the terms in a contract], but, rather, the application of the judicial construction of the

15

language to the facts." *Holt*, 507 So. 2d at 395. Accordingly, while "the *meaning* of 'regular use' or 'frequent use' was properly for the determination of the court," "the issue of whether an automobile is furnished or available for the regular or frequent use of another under the terms of a non-owned automobile clause in a contract of insurance is ordinarily a question of fact" for the jury. *Holt*, 507 So. 2d at 394–95 (italics in original). The Alabama Supreme Court concluded that, under the factual circumstances of *Holt*, the trial court properly sent the issue to the jury. *Holt*, 507 So. 2d at 395.

Still, "ordinarily" does not mean "always." As compared to the ten-day period of use of the Buick in *Holt*, B.G.C. drove the Jeep for a year or more, six months of which consisted of near-daily use after B.G.C. received her driver's license. (Doc. 33, p. 42, tp. 26; Doc. 37-6, p. 9–10, tpp. 27–35; tp. 35; Doc. 37-7, p. 8, tpp. 22–24; ALA. CODE § 32-6-7.2(a) (2024)). In fact, after B.G.C. received her driver's license, B.G.C. parked the Jeep at Mr. Carter's house to permit B.G.C.'s daily access to the Jeep. (Doc. 37-1, p. 13, tp. 42; Doc. 37-6, p. 19, tp. 73). On this record, no reasonable and fair-minded person could conclude that the Jeep was not furnished or made "available" to B.G.C. for "regular use," i.e., that the Jeep "c[ould not] be usually and regularly had or be used whenever it is wanted, needed or desired" by B.G.C. *Holt*, 507 So. 2d at 394 (citation omitted). Accordingly, there is not substantial evidence to support a finding that the Jeep is a **non-owned auto** under

16

Mr. Carter's Farmers policy, and Farmers is entitled to summary judgment on this issue.[15]

The Jeep does not qualify as a **covered auto** either.  The only category of **covered auto** that defendants argue the Jeep falls into is **substitute auto**.  (*See* Doc. 37-5, pp. 8, 10–11).  Under the Farmers policy, a **substitute auto** is "an **auto**" that neither Mr. Carter nor B.G.C. owned "which is used with the owner's permission to replace a **covered auto** for a short time."  (Doc. 37-5, p. 10).  The Farmers policy does not define the term "a short time," and the Court has not found an Alabama appellate court decision discussing the meaning of that phrase in the context of an

---

[15] The defendants argue that "the purpose behind the non-owned auto exclusion would not be served by applying it to this case." (Doc. 38, pp. 6–8).  The defendants essentially argue that they paid to have insurance coverage to have two cars on the road at the same time, and because the Chevelle was not functional, there were only two cars on the road at the same time, the Jeep and Mr. Carter's truck. (Doc. 38, pp. 6–8).  The argument oversimplifies insurance coverage.  For example, obtaining discounted coverage for a low-cost vehicle and then swapping the insured car for a high-priced vehicle without notice to the insurer would not secure coverage for the newer vehicle simply because the insured still was operating only one vehicle.  The cost of coverage varies with the characteristics of the insured vehicle. *Cf. Holt*, 507 So.2d at 393 (noting it would be a problem if "an insured could secure a high amount of liability coverage on a single automobile, secure lower amounts of liability coverage on other automobiles, and then seek to apply the higher coverage to the under-insured vehicles without paying for the increased coverage"); *accord Benjamin*, 650 F.2d at 100 (stating, in case decided under Texas law, that [the] "clear intent of such ["regular use"] provisions [is] to protect the insurance companies from inadequate premiums for the automobiles which they cover.").  More importantly, "[w]here contract terms are unambiguous, we do not look beyond the plain language of the contract to second-guess the intentions of the parties; nor will we speculate about what may have been the subjective expectations of the parties." *Alabama Title Loans, Inc. v. White*, 80 So. 3d 887, 893 (Ala. 2011) (quoting *Title Max of Birmingham, Inc. v. Edwards*, 973 So. 2d 1050, 54–55 n.1 (Ala. 2007)).  Mr. Carter's Farmers' policy unambiguously excluded vehicles available for regular use by the insured or the insured's relative from the definition of **non-owned auto**.  Thus, the Jeep is not a covered **non-owned auto**.

17

insurance policy.  Farmers argues that, as a matter of law, "a short time" is "a brief time," and B.G.C.'s "exclusive," "indefinite," and "open-ended" use of the Jeep "for 10 months before the Accident" does not qualify as "a short time."  (Doc. 37, pp. 17–19).  The defendants argue that the Court should define "a short time" as "temporary" and that the Court should find as a matter of law that B.G.C.'s use of the Jeep was temporary because Ms. Upton and Mr. Carter intended for B.G.C. to use the Jeep only until the Chevelle was repaired.  (Doc. 34, pp. 14–23; Doc. 36, pp. 16–24; Doc. 38, pp. 1–6).

The phrase "a short time" in the Farmers policy does not mean "temporary" as defined by the named insured's subjective intentions regarding the use of a vehicle that is not listed in the policy.  *See Harbison v. Strickland*, 900 So. 2d 385 (Ala. 2004) (citations omitted) ("[I]t is the terms of the written contract, not the mental operations of one of the parties, that control its interpretation. . . . [T]he law of contracts is premised upon an objective rather than a subjective manifestation of intent approach.").  Linguistically, "temporary" is a term indicating the impermanence of a current condition, while "a short time" is a term of duration.[16]

---

[16] *McKee v. Exch. Ins. Ass'n*, 120 So. 2d 690 (Ala. 1960), which the defendants cite, is inapposite. After his car was destroyed, the insured in *McKee* used an alleged substitute auto, his mother's car, "four or five times" and used "other people's automobiles," including "cars owned by his employer." *McKee*, 120 So. 2d at 690, 692.  The Alabama Supreme Court found that the insured used his mother's car "temporarily" because "the insured was using his mother's car for the day only at the time of the accident." *McKee*, 120 So. 2d at 692.  Here, B.G.C. used her mother's Jeep for at least the six-month period between her sixteenth birthday in April and the accident in October, with no specific endpoint planned for that use. (Doc. 37-1, pp. 8, 12–15, tpp. 23, 39–52;

18

As Farmers argues, the phrase "a short time" must be construed against the backdrop of a twelve-month insurance policy. (Doc. 39, pp. 13–16). Including the time on her learner's permit, B.G.C. used the Jeep for at least twelve months. (Doc. 37-2, p. 2; Doc. 37-6, pp. 24–31, tpp. 91–118; Doc. 37-7, p. 8, tp. 24); ALA. CODE § 32-6-7.2(a) (2024). Mr. Carter owned the Chevelle for ten of those months. (Doc. 37-7, p. 7, 30, tp. 19, ex. 1). Seven of those months were on the current policy term. (Doc. 37-5, p. 4). For six of those months, B.G.C. regularly used the Jeep after she received her driver's license. (Doc. 37-1, p. 8, 12–15, tpp. 23, 39–52; Doc. 37-6, pp. 6, 8, 10, 19 tp. 16, 24, 35, 73; Doc. 37-7, pp. 8, 12, 14, tpp. 22, 40, 47). No reasonable juror could find that B.G.C.'s use of the Jeep as a "substitute auto" for more than half the policy term was for "a short time." *See CACI Int'l v. St. Paul Fire & Marine Ins. Co.*, 567 F. Supp. 2d 824, 830 (E.D. Va. 2008) (granting summary judgment for insurer because "[g]iven the twelve-month duration of the [general commercial insurance] policy, characterizing a multi-month overseas deployment as 'a short time' away from the coverage territory would strain the ordinary meaning of 'a short time.'"), *aff'd*, 566 F.3d 150 (4th Cir. 2009).

This reading is confirmed by a consideration of the purposes behind the substitute auto provision. A substitute auto must replace a covered auto that is "out of normal use due to" "breakdown," "destruction," "loss," "repair," or "servicing."

---

Doc. 37-6, pp. 6, 8, 10, 19 tpp. 16, 24, 35, 73; Doc. 37-7, pp. 8, 12, 14, tpp. 22, 40, 47).

19

Doc. 37-5, pp. 10–11. Generally, substitute auto provisions "make the coverage reasonably definite as to the vehicles the insured intended normally to use, while at the same time permitting the [insured's regular] operations to go on should the particular vehicles named be temporarily out of commission." *Lloyds Am. v. Ferguson*, 116 F.2d 920, 923 (5th Cir. 1941) (analyzing claim under Mississipi law). While such clauses "should be and are given reasonable and liberal construction to effectuate the coverage actually intended," the clauses do not provide unlimited, "blanket coverage of any and all vehicles which the [insured] might own or operate." *Lloyds*, 116 F.2d at 923. "A short time," then, is limited to the time reasonably necessary to cure one of the listed conditions in the mine-run of situations by either fixing or replacing the covered vehicle. No reasonable juror could find that six-plus months is "a short time" to fix one of the listed conditions. As such, the Jeep does not qualify as a substitute auto and therefore is not a **covered auto** under Mr. Carter's primary Farmers policy.

The excess liability Farmers policy likewise does not provide coverage. The parties agree that the excess liability policy provides coverage only if the underlying policy covers the vehicle. (Doc. 36, p. 24; Doc. 37-8, p. 7; Doc. 38, pp. 12–13; Doc. 39, p. 24). Because the underlying policy does not provide coverage, neither does the excess liability policy.

***

Accordingly, the Court grants Farmers's motion for summary judgment.  The Court denies the defendants' motions for summary judgment.  By separate order, the Court will enter judgment for Farmers in this matter.

The Clerk of Court shall please TERM Docs. 35 and 37.

**DONE** and **ORDERED** this March 17, 2026.

**MADELINE HUGHES HAIKALA**
UNITED STATES DISTRICT JUDGE

21